**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| NIESHA BROWN, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-08-02888 |
| | § | |
| KASTLE SYSTEMS OF TEXAS LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Niesha Brown sued her former employer, Kastle Systems of Texas, alleging disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, and breach of contract and intentional infliction of emotional distress under Texas common law. Brown alleges that Kastle violated the ADA by: (1) unlawfully terminating her employment because she was paralyzed on one side of her body, in violation of the ADA; (2) failing to respond to her request for reasonable accommodation; and (3) engaging in disability-based workplace harassment. Brown further alleges that Kastle's termination breached an oral contract assuring her continued employment. Finally, Brown alleges that between Brown's surgery and her discharge, Kastle intentionally inflicted emotional distress. Kastle responds that Brown's paralysis does not meet the ADA definition of "disability" and that at the time of Brown's termination, she was not a "qualified individual" for the positions of alarmist and night-shift supervisor. Kastle denies discriminating against Brown and argues that it terminated her employment because she exhausted her Family Medical Leave Act (FMLA) leave and did not return to work. Kastle also denies that it breached any oral contract or that it intentionally inflicted severe emotional distress.

After discovery, Kastle moved for summary judgment.[1]  Based on a careful review of the pleadings; the motion, response, reply, and surreply; the record; and the applicable law, this court grants Kastle's motion in part and denies it in part.  For the reasons stated in detail below, this court denies summary judgment on Brown's unlawful termination and reasonable accommodation claim under the ADA but grants summary judgment on the disability-based workplace harassment, breach of contract, and intentional infliction of emotional distress.  A status conference is set for **September 16, 2010, at 8:30 a.m.,** to set a schedule for the resolving the issues that remain to be tried.

## I.    Background

Beginning in April 2005, Brown worked at Kastle's Operations Center in Houston, Texas. (Docket Entry No. 36-1, Ex. A at #4).  Kastle designs, installs, and monitors security systems for commercial buildings in Dallas, Houston, and Los Angeles. (Docket Entry No. 32-2, Ex. 1 at 1). At the Operations Center, Kastle employees—called  "alarmists"—make, answer, and process telephone calls from Kastle clients.  (*Id.* at 2).  Brown worked as an alarmist until Kastle promoted her to the position of night-shift supervisor.  (Docket Entry No. 36-1, Ex. A at #5).  As night-shift supervisor, Brown supervised several alarmists.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 40).

In February 2006, Brown suffered injuries in a car accident.  (Docket Entry No. 36-1, Ex. A at #6).  During treatment, her physicians fortuitously discovered a colloid cyst on her brain.[2]  (*Id.*). One physician informed Brown's mother, Charlotte Brown, that without this discovery, Brown could

---

[1] Kastle's motion for summary judgment is filed at Docket Entry No. 32.  Brown responded, (Docket Entry No. 36),  Kastle replied, (Docket Entry No. 40), and Brown surreplied, (Docket Entry No. 41).

[2]   A colloid cyst is a cyst containing gelatinous material in the brain.  BLAKISTON'S GOULD MEDICAL DICTIONARY 297 (4th ed. 1979).  Colloid cysts can cause obstructive hydrocephalus and increased intracranial pressure.

have died within a year.  (Docket Entry No. 36-22, Ex. T at # 5).  The cyst required surgery, which

Brown scheduled for June 2006 with Dr. Aaron Mohanty.  (*Id.* at #7).

Brown told Andy Steckbeck, Kastle's Operations Center Manager, and Ramona Brady, her

immediate supervisor, about the surgery in advance and explained that she would need some time

off.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 42; Docket Entry No. 36-1, Ex. A at # 10).

Initially, Brown found her superiors supportive of her surgery.  Brown kept a contemporaneous

journal.[3]  The entry for May 26, 2006 states, "they told me whenever I get out of the hospital my

job will still be there with the same pay."[4]  (Docket Entry No. 36-15, Ex. N at 312).  While Kastle

understood that Brown would be taking leave, neither Kastle nor Brown appears to have established

the specific leave terms.  Kastle asserts that it considered Brown's leave covered under the FMLA.[5]

(Docket Entry No. 32, at 5).  Brown responds that the office manager, Jennifer McCormick, told her

---

[3] Because memory loss could result from Brown's surgery, Dr. Mohanty recommended that Brown keep a journal. Docket Entry No. 36-15, Ex. N at 311).

[4] Kastle objects that the journal constitutes hearsay.  There are two levels of hearsay in Brown's journal. First, the statement attributed to Brown's supervisors is hearsay.  That statement is admissible as an admission by a party-opponent.  FED. R. EV. 801(d)(2).  Second, the journal entry itself is hearsay; it is Brown's out-of-court statement offered for the truth of the matter asserted.  FED. R. EV. 801(C).  The journal or certain entries could be nonetheless admissible at trial.  Brown could provide testimony of the journal's contents based on her personal knowledge.  FED. R. EV. 602.  The journal could be used to refresh Brown's recollection during her testimony.  FED. R. EV. 612(1–2).  Because the hearsay evidence could be presented in a form that would be admissible at trial, it may be considered on summary judgment.  *See Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003) (finding that a diary may be considered at summary judgment because its contents could be introduced through live testimony or to refresh witness's recollection); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990), *cert. denied*, 499 U.S. 921, 111 S. Ct. 1313, 113 L. Ed. 2d 246 (1991)  (holding that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony in a form that would be admissible at trial).

[5] Though Kastle claims in its brief that this was its understanding, the record provides little support.  The citations provided by Kastle in Docket Entry No. 32 at 5 n.17 merely indicate that Kastle determined in or around November 2006 that Brown had exhausted her FMLA leave.  The additional citations describe how Kastle filled Brown's position during her leave.

not to worry about any FMLA paperwork.  (Docket Entry No. 36-1, Ex. A at # 10).  Aside from this

recollection, Brown does not articulate her understanding of the leave terms.

Brown had surgery in June 2006.  As an unfortunate result, Brown developed paralysis on

one side, or hemiplegia.  (Docket Entry No. 33-1, Ex. 8).  Her left side was affected.  After the

surgery, she "could not roll over, bathe or shower, clean the house, get out of bed, get dressed, drive,

cook, walk up and down steps, handle [her] personal hygiene, perform manual tasks, remain

balanced, remain coordinated, lift, grab, grasp and more."  (Docket Entry No. 36-1, Ex. A at #12).

Brown moved in with her mother and remained there at least through the beginning of this litigation.

(Docket Entry No. 36-22, Ex. T at #25).  Brown's neurosurgeon, Dr. Mohatny, recommended

physical therapy.  (Docket Entry No. 36-10, Ex. J).

After the surgery, Brown filed for disability benefits with the Reliance Standard Life

Insurance Company.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 103).  She received short-

term disability benefits through September 19, 2006.  (Docket Entry No. 33-2, Ex. 17).  On

September 7, 2006, she applied for long-term disability benefits, representing that she was "totally

disabled."  (*Id.*).  She would receive long-term disability benefits for the next 24 months.  (Docket

Entry No. 33-2, Ex. 2A, Brown Depo. at 103–04).  In December 2008, Brown also began to receive

Social Security benefits.  (*Id.* at 104–05).

During the first few months after surgery, Brown felt supported by Kastle.  Brown's mother

contacted McCormick to inform her of the surgery's results.  (Docket Entry No. 36, Ex. T at #8).

According to Brown's mother, McCormick helpfully provided her with insurance telephone numbers

and told her not to worry about FMLA paperwork.  (*Id.*).  Steckbeck also visited Brown once at the

hospital.  Brown's mother stated that during his hospital visit, Steckbeck assured Brown that her

job would remain available.  (Docket Entry No. 36-22, Ex. T at #10).  Steckbeck continued to have

4

phone conversations with Brown after she left the hospital about her condition and about her return to work.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 25–27).  In later conversations, Steckbeck expressed a willingness to accommodate Brown.  According to Brown, Steckbeck suggested she return as an alarmist to become acquainted with a new system Kastle implemented.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 31).  Steckbeck told Brown that she would need to take a typing test before she could return to work under company policies, but indicated that the requirement had some flexibility.  Though the typing test required a returning employee to type thirty words per minute, Steckbeck told Brown that twenty words per minute might suffice for her.[6]  (Docket Entry No. 37-3, Ex. R at 12–16).

Brady also kept herself apprised of Brown's condition and talked with her.  Steckbeck told Brady about the surgery results after he visited Brown in the hospital.  Steckbeck told Brady "that there was some paralysis . . . on one side or the other." (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 54, 54–55).  Like Steckbeck, Brady discussed with Brown the possibility of her returning as an alarmist.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 31).  As for the typing test, Brown claims that Brady also reassured her that if she could not type at the usual required rate, Brady could work with her.  (*Id.* at  30).

By Brown's account, two events caused Kastle to change its attitude toward her continued employment.  First, months after her surgery, in August or September 2006, Brown visited Kastle.

---

[6] Brady described the typing test's history in her deposition.  According to Brady, in 2005 she and Tom Radigan, Kastle's Operations Manager, implemented a policy requiring all employees with a break in service exceeding ninety days to recertify several preemployment tests, including a typing test.  (Docket  No. 32-4, Ex. 3, Brady Dep. at 70–71).  Brady stated that she and Radigan implemented the typing test because Kastle "had a lot of coming and going," and also because the Texas Board of Private Investigators, which regulates Kastle, required background and skills tests on its employees.  (*Id.* at 71).  The typing test is not mentioned in Kastle's Employee Handbook. (Docket Entry No. 36, at 20).  Nor does Kastle point to any regulation from the Texas Board of Private Investigators requiring such a test. (*Id.* at 27).

(Docket Entry No. 32-4, Ex. 3, Brady Depo. at 58–59).  During her visit, Brown used a cane to get around and also needed her mother's help to climb stairs.  The Operations Center did not have an elevator.   (Docket Entry No. 32-4, Ex. 3, Brady Depo. At 61; Docket Entry No. 36-1, Ex. A at #15).

At Kastle, Brown spoke with Brady about physical-therapy progress.  Brown told Brady that she would be able to return to work after a follow-up visit with her doctor.[7]  (*Id.* at 60–61).  Brown recalls feeling uncomfortable at how Brady looked at her.  (Docket Entry No. 36-1, Ex. A at #16).  Second, shortly after Brown's visit, Kastle received notice that she had suffered a relapse and that her recovery could take somewhat longer than expected.  (Docket Entry No. 36-8, Ex. H).  Brady and Steckbeck learned this information from Kastle employee Joy Shukura-Gardner, who had talked to Brown.  (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 63).

After these events, Brown perceived a change in Kastle's attitude toward her employment. Within days after her visit to Kastle, Brady began to insist that she take her preemployment test. (Docket Entry No. 36-1, Ex. A at #18).  Brown began recording her conversations with Kastle representatives, including a conversation with Steckbeck about the preemployment test.  (Docket Entry No. 37-3, Ex. R).  In the conversation, Steckbeck expressed surprise when asked about other employees who returned to work after extended absences without having to take the test.  (*Id.* at 3). Steckbeck also told Brown that Brady wanted her to take the test because of a concern that her "left side wasn't working."  (*Id.* at 3).  Brady acknowledged in her deposition that after receiving Shukura-Gardner's email about Brown's relapse, she and Steckbeck decided to fill Brown's position with someone else, on a permanent basis, and also to require Brown to undergo the preemployment

---

[7] The anticipated date of this doctor's appointment is not clear. Brady's deposition refers to a "follow-up visit" after which Brown was expected to be "free to return."  (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 61).

testing before deciding whether to allow her to return to work in a different position.[8] (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 63).   Neither Brady nor Steckbeck told Brown about these decisions.      Kastle did not discharge Brown until months later, in March 2007.[9] (Docket Entry No. 36, at 12-13).   There was little communication between Kastle and Brown between her September or August 2006 visit to the Operations Center and the March 2007 discharge.   An October 2006 email from Brady to McCormick states that Brown had asked for a time to take the typing test and that Brady informed her to come take it anytime during business hours.  (Docket Entry No. 36-9, Ex. I).   Brown points out that Kastle imposed no time limit on her taking the test. She did not come to the office to try to take the test until January 2007. (Docket Entry No. 36, at 11; Docket Entry No. 36-22, Ex. T at # 18).

In November 2006, Kastle's Human Resources Manager, Donna Saunders, sent Brown a letter informing her that she had exhausted her FMLA leave as of September 10, 2006.  (Docket Entry No. 36-3, Ex. C).   The letter stated that Kastle "would like to explore whether there are accommodations that would allow [Brown] to return to work."   (*Id.*).   Kastle asked Brown for specific recommendations from a health care provider.  (*Id.*).   The letter concluded: "It is imperative that you contact us as to the status of your condition, any request for accommodation and anticipated return date so Kastle can make a determination as [to] what further actions [are] to be taken regarding your position with Kastle."  (*Id.*).   Perplexed by the letter, Brown's mother contacted

---

[8] The record provides no evidence as to whether Kastle actually did fill Brown's position; it merely contains evidence of Kastle's intention to fill Brown's position.  Further, the record provides no evidence that if Kastle did fill Brown's position, it informed her at any point prior to her discharge.

[9] Before these events, on October 17, 2006, Kastle fired Steckbeck. (Docket Entry No. 36, Ex. U2, Steckbeck Termination Letter).  According to the termination letter, Kastle wanted a manager with more call-center experience who could better balance operational objectives and further employee development. (*Id.*).

7

Saunders, who said that it was "just a letter" informing Brown that her FMLA benefits had ended. (Docket Entry No. 36-22, Ex. T at #16).  On December 29, 2006, Brown received a second letter from Saunders stating that she needed to pay her employee portion of insurance premiums.  (*Id.* at #17).  Brown's mother called Saunders and agreed to pay the premiums.  (*Id.*).  Brown notes that in none of these conversations did Saunders or anyone from Kastle set a firm date by which Brown needed to return to work.  (Docket Entry No. 36, at 13).

In January 2007, Dr. Mohatny told Brown that she could resume "appropriate duties taking into account of her left sided weakness."  (Docket Entry No. 41-1, Ex. A).  He also advised continuing therapy and rehabilitation.  (*Id.*).  After meeting with Dr. Mohatny, Brown and her mother went to Kastle to take the preemployment test. (Docket Entry No. 36-22, Ex. T at # 18). They asked for Ramona Brady, but she was unavailable.  (*Id.*).  They left without Brown taking the test.

On some unknown date either before or after this attempt to take the typing test, Saunders contacted Brown.  Speaking to her mother, Saunders stated that before Kastle could "proceed,"[10] the FMLA certification form needed to be completed.  (*Id.* at #19).  Brown's mother responded that McCormick had told her not to worry about FMLA paperwork.  (*Id.*).  Saunders sent Brown the FMLA papers, and Brown forwarded it to Dr. Mohatny to be filled out.  (*Id.* at #19–20).  Dr. Mohatny in turn completed the paperwork and returned it to Kastle.  (Docket Entry No. 36-5, Ex. E).

In Dr. Mohatny's answers on the FMLA paperwork, he stated that for six months to one year, Brown could work but not on a full schedule, and  Brown could not do work requiring the use of *both* right and left extremities.  (*Id.*).  Brown also provided letters from Dr. Mohatny and Dr.

---

[10] The record does not further clarify what Saunders meant by "proceed."

Stephen Yang. Dr. Mohatny's letter stated that Brown had "made significant improvement over the past several months" and was "able to ambulate on her own with a mild degree of limp." (Docket Entry No. 36-10, Ex. J). He "strongly recommended" that she continue physical and occupational therapy for the next three months. (*Id.*). Dr. Yang commented on the "tremendous gains" Brown made "in her activities of daily living, gait, endurance, and overall ability to function." (*Id.*). But, Dr. Yang noted, Brown still had "lingering effects" and lacked the ability to do "some high level tasks efficiently . . . such as typing a keyboard or operating a phone switchboard." (*Id.*). Dr. Yang expressed doubt that Brown could make a "full time return to work" but noted that with "aggressive" rehabilitation, she could "eventually return to work on a full time basis."[11] (*Id.*).

In March 2007, Kastle formally terminated Brown's employment. Kastle's termination letter noted that Brown exhausted her twelve weeks of FMLA leave, had not reported to work, and had not provided a return-to-work date. (Docket Entry No. 32-7, Ex. 6). Brown argues that when she received the letter, Kastle could have employed her as an alarmist or as a night-shift supervisor. Because neither job required the use of both hands, Brown felt that she could complete either job's functions using only her right arm and hand. (Docket Entry No. 36-1, Ex. A at #23–27). Brady's deposition confirmed that neither job's "Specific Functions" required the use of both hands. (Docket

---

[11] Though Kastle did not have access to the following in March 2007, the record provides additional reports from physicians treating Brown about her physical condition around that time. First, in response to a question from Reliance Standard, Dr. Mohanty indicated that "There is a degree of neurological impairment, but there is ability to carry out most activities of daily living as well as pre-morbid state." (Docket Entry No. 33-1, Ex. 10). Second, a report by an examining physical therapist indicated that Brown could complete, "with minimal assistance," the following tasks: grooming, dressing her lower extremities, household chores, and simple meal preparation. (Docket Entry No. 33-1, Ex. 11). The report further indicated that with supervision, she could dress her upper extremities. (*Id.*). And, with modified independence–e.g., extra time or an assistive device–she could use the toilet, bathe, and transfer herself to the bed, to the toilet, and to the bathtub or shower. (*Id.*).

Entry No. 32-4, Ex. 3, Brady Depo. at 125–26).[12]  The only accommodations Brown felt she might need were a modified schedule to allow her to go to therapy and access to the second floor.  On the second accommodation, Brown believed that she could climb the stairs slowly.  (Docket Entry No. 36-1, Ex. A at #24).

Brown continued to meet with doctors after her job termination.  She saw Dr. Monika Shah, the physician in charge of her rehabilitation, twice during April and May of 2007.  (Docket Entry No. 33, Exhibit 2B, Brown Depo. at 114).  Dr. Shah's May 2007 report noted that Brown used a cane for short distances and a wheelchair for long distances and that she still "needs assistance with all activities of daily living."  (Docket Entry No. 37-1, Ex. Q1, May 23 Shah Report).  Dr. Corwin Boake also saw Brown once during this period.  His report concluded that Brown had "selective impairments in left-sided motor and tactile functioning."  (*Id.*).  In his recommendations, Dr. Boake wrote: "She has the potential to function more independently, including outside the home."  (*Id.*).  He added: "She may have potential for return to school and possibly in the long run to have some earning capacity. This will depend if a modified job can be designed."  (*Id.*).

Reliance Standard, Brown's disability insurer, continued to communicate with her and her physicians.  In June 2007, Dr. Shah filled out a Physical Capabilities Questionnaire for Reliance Standard.  In the form, Dr. Shah indicated that Brown *could not* perform the following activities on a regular basis in an eight-hour workday: standing, walking, squatting at the knees, climbing stairs or ladders, kneeling, crawling, using foot controls, or driving.  (Docket Entry No. 37-2, Ex. Q2).  Brown *could* continuously use her right arm for simple grasping, reaching above mid-chest, reaching at the waist level, fine manipulation, feeling, and pushing or pulling.  (*Id.*).  By contrast, she could

---

[12] During the deposition, Brady was shown two documents, marked Exhibits 10 and 11, which purported to list the "Specific Functions" of the jobs of alarmist and night-shift supervisor.  Neither party has made these documents available in the record.

only occasionally use her left arm for grasping and reaching at the waist level.  (*Id.*).  And she could not use her left arm at all for reaching above mid-chest, pushing or pulling, fine manipulation, or feeling.  (*Id.*).  In July 2007, Brown indicated to Reliance Standard that the date on which she could resume employment was "unknown."  (Docket Entry No. 33-2, Ex. 14).  That same month, Dr. Mohanty told Reliance Standard that the "left-side weakness" in Brown's hand made her disabled.  (Docket Entry No. 33-2, Ex. 15).  Again in July 2007, Dr. Shah represented to Reliance Standard that Brown had been disabled since June 13, 2006.  (Docket Entry No. 33-2, Ex. 16).

Brown sued Kastle on September 29, 2008.  In her complaint, Brown alleged that Kastle discharged her because of her disability, failed to provide reasonable accommodation, and harassed her, all in violation of the ADA  Brown alleged that Steckbeck's and Brady's assurances to her that her job would remain available after her surgery modified her  employment-at-will status and that Kastle breached this modified employment contract by discharging her after her surgery.  Finally, Brown alleged that Kastle's conduct intentionally inflicted severe emotional distress.  Kastle moved for summary judgment on all claims.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes XX, Inc.*,

11

109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion

for summary judgment must be denied, regardless of the nonmovant's response.  *United States v.*

*$92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008).

    When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a

motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v.*

*Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial.  *See id.*  The nonmovant must

do more than show that there is "some metaphysical doubt as to the material facts."  *Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which

the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).  In deciding a summary judgment motion, the court reviews the facts drawing all reasonable

inferences in the light most favorable to the nonmovant.  *Id.* at 255; *Marathon E.G. Holding Ltd. v.*

*CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir. 2010).

## III.    The ADA Claim

    In her complaint, Brown alleged that Kastle discriminated against her "on the basis of her

disability, her history and record of having a disability [or] because she was regarded as having a

disability."  (Docket Entry No. 12, at 5).  Specifically, Brown alleged that

> "(1) Defendant denied Plaintiff an accessible entrance into its facility, (2) Defendant
> refused to allow Plaintiff to return to work, (3) Defendant arbitrarily insisted on
> Plaintiff taking a typing test to see if her left side worked, (4) Defendant arbitrarily
> rejected and disregarded Plaintiff's medical documentation from her physician, (5)
> Defendant made oral promises to keep Plaintiff's job open for her during medical
> leave yet terminated Plaintiff, (6) Defendant purposefully misled Plaintiff about her

12

obligations and duties that it ultimately held Plaintiff responsible for, and (7) [o]ther harassing communications and conduct."

(*Id.*).  Brown's complaint asserted three separate causes of action under the ADA.  Brown alleged that Kastle denied Brown the reasonable accommodations of (1) an accessible entrance to its facility and (2) the reasonable accommodation requested through her physicians, a work schedule that took into account her left-sided weakness and need for physical therapy; that Kastle wrongfully terminated her employment because of her disability; and that Kastle engaged in disability-based workplace harassment.

Kastle argues that the undisputed evidence shows that as a matter of law, Brown had no disability and that she was not a "qualified individual" for the positions to which she sought to return.  (Docket Entry No. 32, at 8–19).  In response to Brown's reasonable accommodation claim, Kastle argues that Brown did not request reasonable accommodation.  (Docket Entry No. 32, at 19–22).  In response to Brown's wrongful discharge claim, Kastle argues that it discharged Brown because she had exhausted her FMLA leave and refused to return to work.  (*Id.*).  Finally, Kastle argues that to the extent Brown suffered any disability-based workplace harassment, it did not occur while she was actually working at Kastle nor was it so severe and pervasive to affect a term, privilege, or condition of employment.  (Docket Entry No. 32, at 22–26).

Brown has the burden of a *prima facie* showing under the ADA.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003).  Section 12112(a) of the ADA states:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

13

42 U.S.C. § 12112(a).[13]   The elements of a *prima facie* showing of disability discrimination under the ADA are that the plaintiff is a "qualified individual" with a "disability" who suffered an adverse employment action because of the disability.  *See Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999).  "To obtain the right to present his case to a jury, a plaintiff must, at minimum, adduce evidence upon which a rational jury could, as a matter of law, find in his favor."  *Gowesky*, 321 F.3d at 512.

## A.     Disability

"As a threshold requirement in an ADA claim, the plaintiff must . . . establish that he has a disability."  *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 758 (5th Cir. 1996).  "A plaintiff cannot assert that his employer is required to make reasonable accommodations to his physical or mental limitation until he satisfies the test for disability discrimination."  *Lindsey v. Chevron USA Inc.*, 51 F. App'x 929, No. 02-60056, 2002 WL 31415255, at *4 (5th Cir. 2002).  In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action, which in this case is March 2007, when Kastle terminated Brown's employment.  *Chevron Phillips*, 570 F.3d at 618.

Brown argues that she was substantially limited in the major life activities of caring for herself and walking.  Kastle responds that Brown had no "actual disability" because she was not substantially limited in either activity, pointing to evidence that she could function independently.  Kastle also argues that because Brown's condition improved in response to physical therapy, it was "temporary" and "short term" as opposed to "long term" or "permanent."

---

[13]   Brown filed this lawsuit September 29, 2008.  Congress enacted the ADA Amendments Act of 2008, effective January 1, 2009.  Pub. L. No. 110-325, 122 Stat. 3553 (2008).  Because the amendments do not apply retroactively, they are inapplicable to this case.  *See E.E.O.C. v. Agro Distrib. LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009).

The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(2).  "Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (quoting 29 C.F.R. § 1630.2(I)); *see also Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 201, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002).  A plaintiff  "must also show that the limitation on the major life activity is substantial." *Hinojosa v. Jostens Inc.*, 128 Fed. App'x 364, 366 (5th Cir. 2005).        "Disability" requires a plaintiff to be "prevented or even severely restricted from performing" the activities of "daily living." *Id.* at 367.  For the major life activity of taking care of oneself, an inability by the plaintiff to complete tasks of daily living "by herself or in the amount of time an average person would require supports a reasonable inference that she was substantially limited in caring for herself." *E.E.O.C. v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 617 (5th Cir. 2009).  For the major life activity of walking, the plaintiff must demonstrate more than a "moderate difficulty." *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999).

For an impairment to be a "disability," the impact must be "permanent or long term." *Id.* at 1024; *see also Hinojosa*, 28 Fed. App'x at 368.  "The term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir.1997)  (citation omitted), abrogated on other grounds by *Baird ex. rel. Baird v. Rose*, 192 F.3d 462 (4th Cir.1999).  But an indefinite expected duration of an individual's disability does not necessarily defeat an ADA action. *Chevron Phillips Chemical*, 570 F.3d at 618.

15

### 1.    Caring for Herself

Brown alleges and presents competent evidence that at the time of her March 2007 discharge, she was substantially limited in the major life activity of caring for herself.  Two months after Brown's employment termination, Dr. Shah, the physician charged with Brown's rehabilitation, noted generally that she "needs assistance with all activities of daily living." (Docket Entry No. 37-1, Ex. Q1, May 23 Shah Report).   Dr. Shah specifically noted that Brown "required setup with feeding and grooming", required "minimum assistance" with bathing, and was "modified independent" in upper and lower body dressing.  (*Id.*).   A physical therapist report in the record defines "modified independence" as "extra time needed [and]/or assistive device." (Docket Entry No. 33-1, Ex. 10).   One month after Brown's job termination, Dr. Shah noted her need for "assistance with shower transfers, hygiene when toileting, cooking meals, upper and lower dressing." (Docket Entry No. 37-1, Ex. Q1, April 10 Shah Report).  A treating physical therapist's report close in time to Brown's termination also noted that she required "minimal assistance" with grooming, lower extremity dressing, simple meal preparation, and household chores.  (Docket Entry No. 33-1, Ex. 11).  The report defined someone needing "minimal assistance" as someone who could do seventy-five percent of each task but required assistance to complete it.  (*Id.*).  The same report indicated that Brown required supervision for upper-extremity dressing, but that she could, with extra time or an assistive device, get in and out of bed, get on and off the toilet, and get in and out of the bathtub or shower.  (*Id.*).  According to Brown's mother, with whom she had lived since the surgery,  as late as the time this suit was filed, Brown could not "tie her shoes, put on her bra, put her socks on, straighten her underwear and skirts, fully put on her pants, button and zip her clothes, and comb her hair." (Docket Entry No. 36-22, Ex. T at #25).  Brown also required assistance to get in and out of the bath tub.  (*Id.*).

16

These are the same types of tasks the Supreme Court identified as having "central importance to people's daily lives." *Toyota*, 534 U.S. at 201 ("[H]ousehold chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives."). Brown's need for additional time and help in completing these tasks at the time of her job termination demonstrates a substantial limitation. *Chevron Phillips Chemical*, 570 F.3d at 617. Similar to the plaintiff in *Chevron Phillips Chemical*, Brown lived with a relative and needed additional time and assistance in many basic acts of self-care. 570 F.3d at 609 ("[Plaintiff] was living with her sister, who assisted her with daily tasks like cooking, washing, shopping, showering, drying, dressing, and using the bathroom (including wiping herself)."). This need for additional time and assistance was critical in the Fifth Circuit's overruling the district court's grant of summary judgment. *Id.* at 617 ("[Plaintiff's] inability to complete these tasks by herself or in the amount of time an average person would require supports a reasonable inference that she was substantially limited in caring for herself."). Decisions from the Sixth and Eighth Circuits are similar. *See Fenney v. Dakota, Minnesota & E.R. Co.*, 327 F.3d 707, 715 (8th Cir. 2003) (finding that a plaintiff who testified that "it takes him twice as long as an average person to perform his 'taking care of himself' tasks—bathing, shaving, preparing a meal, dressing, and going to the restroom" had presented enough evidence to survive summary judgment on the question of whether he was substantially limited in the major life activity of caring for himself); *EEOC v. United Parcel Serv.*, 249 F.3d 557, 562–63 (6th Cir. 2001) (holding that a reasonable jury could find that a plaintiff who suffered such severe allergies that he had to spend all of his nonworking hours in bed and his wife had to assume his household duties was substantially limited in the major life activity of caring for himself).

The record does indicate that much of the assistance Brown required was "minimal." But the record also defines "minimal" in this context as needing what for a healthy unimpaired adult

would be significant help.  And the record presents evidence that Brown also needed extra time to do many of the self-care tasks that healthy unimpaired adults do so quickly as to go almost unnoticed.  The Fifth Circuit in *Chevron Phillips Chemical*, the Eighth Circuit in *Fenney*, and the Sixth Circuit in *United Parcel Serv.* were less concerned with the precise amount of assistance the plaintiff received  as with the fact that the plaintiff needed assistance and  extra time to complete basic tasks of self-care.

Kastle points to statements from Dr. Mohatny and Dr. Yang and to Brown's own comments to a vocational counselor.  Slightly less than two months before Brown was discharged, Dr. Mohatny wrote in a questionnaire from Reliance Standard, Brown's insurer, "there is a degree of neurological impairment, but there is ability to carry out most activities of daily living as well as a pre-morbid state." (Docket Entry No. 33-1, Ex. 10).  But Dr. Mohatny also wrote that "the exact assessment of disability may be determined by the physical medicine and rehabilitation specialist who would be in better position than me to assess her disability."  (Docket Entry No. 33-2, Ex. 15).  In a letter written around the same time, Dr. Yang stated that Brown had made "tremendous gains in her activities of daily living, gait, endurance, and overall ability to function independently." (Docket Entry No. 36-10, Ex. J).  Brown herself, one month after her job termination, told her vocational counselor that she performed "house chores" including "washing the dishes, doing the laundry and vacuuming the carpets." (Docket Entry No. 37-2, Ex. Q2, Howard Vocational Counseling Report at 2).  This evidence, viewed with other record evidence including the statements of Dr. Shah, of the treating physical therapist, and of Brown's mother, create a triable issue of fact as to the existence and extent of Brown's disability at the relevant time.

The cases Kastle cites as comparable can be distinguished.  First, unlike Brown, the plaintiff in *McClure* could "without assistance from others compensate for his impairment through

adjustments." *McClure v. Gen. Motors Corp.*, No. 4:01-CV-878-A, 2003 WL 124480, at *4 (N.D. Tex., Jan. 10, 1993), *aff'd mem.,* 75 Fed. App'x 983 (5th Cir. Jan. 30, 2003).  Brown required assistance.  In *Sherrod*, the plaintiff could perform the routine duties of daily living with the limit that she could not engage in heavy lifting.  *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998).  Brown could not perform many routine duties of daily living without assistance and extra time.  Finally, unlike the instant case, in *Ingalls v. Dutcher,* it was "undisputed that [the plaintiff] can feed herself, drive a car, attend her grooming, carry groceries, wash dishes, vacuum, and pick up trash."  *Ingalls v. Dutcher*, 53 F.3d 723, 726 (5th Cir. 1995).  And in *Ingalls*, the plaintiff admitted that she had trained herself to do everything she needed to do.  *Id.*  These cases do not show the absence of disputed fact issues material to determining whether Brown was disabled.

Next, Kastle argues that Brown's response to physical therapy demonstrates that her condition was only temporary and not permanent or long term.  *E.g.*, *Halperin*, 128 F.3d at 199 ("The term 'disability' does not include temporary medical conditions").  In support, Kastle points to the improvements Brown made and her doctors' optimistic statements about her ultimate recovery.  Dr. Yang's January 2007 letter stated that after seven months, Brown "continue[d] to make gains," would continue to benefit "from an aggressive outpatient rehabilitation program," and "has the capability to eventually return to work on a full time basis."  (Docket Entry No. 36-10, Ex. J).  Similarly, Dr. Mohatny noted in his January 24 letter that Brown had made "significant improvements over the past several months" and that continuing therapy would benefit her.  (*Id.*).  These statements show improvement but do not show that, as a matter of law, Brown's condition

was only "short term."  To the contrary, these statements, in combination with later statements by Brown's health care providers, show a continued and long-term need for physical therapy.[14]

Kastle's line of argument poses two additional problems.  First, under *Chevron Phillips Chemical*, the issue is not, as Kastle frames it, whether Brown's condition would improve over time, but rather, whether at the time of termination Brown had a long-term or permanent disability. *Chevron Phillips Chemical*, 570 F.3d at 618 ("In the present case, the crucial question is whether [the Plaintiff] was suffering an ADA disability at the time of her discharge on February 7, 2003."). In *Chevron Phillips Chemical*, the court found a triable issue of fact as to whether the plaintiff's impairment was sufficiently long-term to be a disability.  The plaintiff's disability symptoms "began to manifest themselves in June or July of 2002, continued through and after her discharge on February 27, 2003, and were of sufficient severity and of expected duration to constitute an ADA disability throughout the entire period."  *Id.*  Here, Brown has put forth sufficient evidence to support an inference of disability over an even longer period, from June 2006 to some time after her discharge in March 2007.  Because Brown puts forth sufficient evidence that throughout this period, she was substantially limited in her ability to care for herself, *Dillon v. Roadway Express* is distinguishable; Brown's disability was not "the most extreme manifestation of an occasional symptom."  129 Fed. App'x 893, 897, 2005 WL 994915 (5th Cir. April 29, 2005). Second, the "fact that the expected duration of an individual's disability is indefinite does not necessarily defeat her action under the ADA."  *Chevron Phillips Chemical*, 570 F.3d at 618.  Administrative guidance cited in *Chevron Phillips Chemical* further illustrates this point.  Under the EEOC guidance, if an impairment's "duration is indefinite and unknowable or is expected to be at least several months,"

---

[14] To this list could be added the statement of Dr. Corwin Boake in May 2007 that Brown had only "potential to function more independently, including outside the home" and "potential for return to school and possibly in the long run to have some earning capacity."  (Docket Entry No. 37-1, Ex. Q1, May 31 Boake Report).

it qualifies as a disability. *Id.*[15]  In contrast, the C.F.R. lists the following as temporary, nondisabling impairments: broken limbs, sprained joints, concussions, appendicitis, and influenza." *Id.* at 619 (citing § 160 app., § 1630(j)).   The evidence as to Brown's condition is more similar to an impairment that is severe and with an indefinite but extended duration than it is to a broken bone or flu, which can be temporarily debilitating but have a relatively short and predictable recovery period.

Brown also alleged and presented evidence of substantial limitation on her ability to drive. Although driving is not a major life activity, *see Wilson* v. *Capital Transp. Corp.*, No. 99-31156, 2000 WL 1568200, at *1 n.4 (5th Cir. Sept. 15, 2000) ("Driving may be ubiquitous in our society, but we are not prepared to hold today that driving is a major life activity for ADA purposes."), an inability to do so may be considered in conjunction with other limits on major life activities.  *See Chenoweth v. Hilsborough County*, 250 F.3d 1328, 1329 (11th Cir. 2001) (considering driving in conjunction with work).   Initially after her surgery, Brown could not drive at all.   Her mother had to drive her the seventy miles from her home in El Campo, Texas to Houston for therapy three times a week. (Docket Entry No. 36-1, Ex. A at #15).  Dr. Shah's May 31 report indicated that Brown did not drive and had no regular transportation for therapy.  (Docket Entry No. 37-1, Ex. Q1, Shah May 23 Report).  The report also recommended a behind-the-wheel driving evaluation.  (*Id.*)  Brown's mother stated that she could not drive a vehicle from June 2006 to August 2007.  (Docket Entry No. 36-22, Ex. T at #25).  Brown's inability to drive does not establish but does support an inference that she was substantially limited in caring for herself..

### 3.      Walking

---

[15]  *See* Duration and Impact of Impairment, EEOC Compliance Manual (2007) § 902.4(d), *available at* http://www.eeoc.gov/policy/docs/902cm.html).

21

Brown has submitted extensive evidence showing that at the time of her March 2007 discharge, she was substantially limited in the major life activity of walking.  First, Dr. Shah's May and April 2007 reports stated that Brown used a "single-point cane for short distances" and a "rental wheelchair for long distances."   (Docket Entry No. 37-1, Ex. Q1, April 10 and May 23 Shah Reports).  Brown's vocational report similarly stated that she would use a cane "when ambulating within her house and to her car" and a wheelchair "for long distances when outside." (Docket Entry No. 37-2, Ex. Q2, Vocational Report at 1).  Brown's vocational report also stated that she could walk only fifteen to twenty minutes before needing walking aids.  (*Id.* at 2).  Brown's need for a wheelchair for longer distances, a cane for shorter distance, and her difficulty in climbing stairs support finding a substantial limitation on her ability to walk.  *See Sapp v. MHI Partnership, Ltd.*, 199 F. Supp. 2d 578, 583, (N.D. Tex. 2002) (finding a triable issue of fact as  to disability based on partial paralysis that required the use of a wheelchair for mobility); *McGarthy v. Ridge*, No. Civ. A. 302-CV-1111P, 2004 WL 1542161 at *4 (N.D. Tex. July 7, 2004) ("[A]n individual who, because of an impairment, can only walk for brief periods of time would be substantially limited in the major life activity of walking." (citing 29 C.F.R. § 1630.2)).

Kastle points to Dr. Yang's and Dr. Mohatny's January 2007 letters acknowledging "tremendous gains in [Brown's] . . . gait" and an ability to "ambulate on her own with a mild degree of limp." (Docket Entry No. 36-10, Ex. J).  Kastle is correct that if this was the only evidence, there might not be a fact issue as to a substantial limitation on walking.  *See Talk*, 165 F.3d at 1025 (walking with a limp and slowly "[do] not rise to the level of a disability"); *Martin v. AIMCO Properties*, No. Civ. A. 3:01-CV-2050-M, 2002 WL 1575411, at *2 (N.D. Tex., July 16, 2002) (impairment consisting only of a "mild limp" inhibiting the plaintiff's ability to walk long distances or for long periods does not rise to the level of disability).  But in addition to her limp, the record

22

also provides evidence that Brown required a wheelchair to walk longer distances outside, could only walk for fifteen to twenty minutes before needing aids, and often needed a cane.  Under *Chevron Phillips Chemical*, the issue is whether Brown was substantially limited in her ability to walk when she was discharged.  The record raises a fact issue as to this question that, with the other fact issues, precludes summary judgment based on the absence of a disability.

### B.    Qualified Individual

Kastle also moves for summary judgment on the basis that, as a matter of law, Brown was not a "qualified individual."  *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999).  Brown alleges and presents evidence that she was a "qualified individual" for the positions of alarmist and night-shift supervisor.  Brown asserts that with access to the second floor — or with enough time to walk the stairs — and a modified work schedule to accommodate her left-side weakness and her need for physical therapy, she could perform the essential functions of either position.  Kastle responds that when it decided to terminate Brown's employment, she was not physically qualified to perform either job.  Kastle argues that Brown's representations on disability benefit applications that she was "totally disabled" estops her from asserting that she was qualified to do either job.

A "qualified individual" is one who can perform the essential functions of a job with or without reasonable accommodation.  42 U.S.C. § 12111(8).  "Reasonable accommodation" may include either "(A) making existing facilities . . . readily accessible" or "(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . training materials or policies . . . and other similar accommodations. . . ."  42 U.S.C. § 12111(9)(A–B).  The ADA "does not require affirmative action in favor of individuals with disabilities.  It merely prohibits employment discrimination against qualified individuals with disabilities, no more and no less."  *Turco v.*

23

*Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) (citation and footnote omitted).  For example, the ADA does not require an employer to create a position nor to assign a disabled employee to an occupied position.  *Still v. Freeport McMoran*, 120 F.3d 50, 53 (5th Cir. 1997).  Nor is an employer "required to create light duty jobs to accommodate disabled employees."  *Hoechst Celanese Corp.*, 101 F.3d at 1094.  "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform."  *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n. 14 (5th Cir. 1997).

The record contains a summary by the Operation Center's manager of the alarmists' duties.  "Alarmists sit at computer terminals and take action based on security and/or emergency signals received from buildings, entry doors, and elevators monitored by Kastle.  Alarmists also make, answer, and process telephone calls from tenants, visitors, management, and other building service personnel."  (Docket Entry No. 32-2, Ex. 1 at 2).  A night-shift supervisor supervises alarmists. (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 40).

The record shows, importantly, that neither the alarmist nor the night-shift supervisor position requires the use of both right and left upper extremities.  When presented with documents listing the "Specific Functions" of both positions, Brady confirmed that neither required the use of both hands or the ability to walk without using a cane or other aid.  (Docket Entry No. 32-4, Ex. 3, Brady Depo. At 125–27).  There is no record evidence as to how often Brown would need to get to the second floor, but Brown testified that she could climb stairs, although slowly.  (Docket Entry No. 36-5, Ex. A at # 24).  The record does not contain evidence that the time required for her to walk up or down the stairs would interfere with her ability to perform either job.

The record is unclear as to when Kastle had filled Brown's job or whether in March 2007 there was an opening for an alarmist or night-shift supervisor.  Nonetheless, Brown has met her

burden of a *prima facie* showing that a position was available.  *E.g.*, *Foreman*, 117 F.3d at 810 & n. 14.  Kastle did not discharge Brown until March 2007, allowing a reasonable inference that a position was available because Kastle had employed Brown until then.  Brown's discussions with Steckbeck and Brady about returning to work as an alarmist also supports an inference that the position was available.  (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 31).  While the record supports an inference that Kastle filled Brown's position shortly after being informed of Brown's need for a longer leave than she expected before September 2006—Brady testified that she then decided to fill Brown's position permanently—this fact, standing alone, does not show as a matter of law that there was no opening for an additional alarmist or night-shift supervisor.  (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 63).  The record does not even show that Kastle actually did fill Brown's position.

The record shows disputed fact issues as to whether, with reasonable accommodations, Brown could perform the essential facilities of either position.  Brown needed "a modified work schedule" to accommodate her left-sided weakness and need to go to physical therapy appointments. (Docket Entry No. 36-1, Ex. A at #24).  While "regular attendance is a necessary qualification for most jobs," *Carmona v. Southwest Airlines Co*, 604 F.3d 848, 859 (5th Cir. 2010), Brown's discussions with Brady and Steckbeck about returning as an alarmist and their willingness to work with Brown support a reasonable inference that Kastle could be flexible with Brown's schedule. The cases are clear that an individual's need for a flexible schedule does not preclude a finding that the individual is qualified.  *Id.* at 859 (the need for a flexible schedule does not prevent finding a qualified individual); *McGregror v. United Healthcare Servs., Inc.*, No. H-09-2340, 2010 WL 3082293, at *9 (S.D. Tex. Aug. 6, 2010) (request for modified work schedule before employment is a reasonable accommodation).  Brown's doctors' testimony supports an inference that with a

25

modified work schedule, she could perform the positions' essential functions.  Two months before Brown was discharged, Dr. Mohatny told her that she could resume "appropriate duties taking into account of her left sided weakness."[16]  (Docket Entry No. 41-1, Ex. A).  Dr. Mohatny completed the FMLA paperwork at Kastle's request, stating that Brown could not perform the essential functions of a job requiring the use of *both* right and left upper extremities.  (Docket Entry No. 36-5, Ex. E).  Such clearance by a treating physician to resume employment supports a reasonable inference of an ability to perform the essential functions of the job.  *See White v. Goodyear Tire and Rubber Co.*, No. 97-20979, 1999 WL 824471, at *2 (5th Cir. Sept. 29, 1999) (two releases from doctors even with restrictions on employment create a genuine issue of fact as to whether the plaintiff was qualified to perform the job).  Dr. Mohatny's FMLA paperwork statement that Brown could return to work "depending on the nature of the job" only strengthens the inference.

Kastle points to the following evidence: (1) Dr. Mohatny's July 2009 statement that "[t]he left-sided weakness . . . has improved to a certain extent, however still present disabling her return to her regular job," (Docket Entry No. 33-2, Ex. 15); (2) Dr. Yang's January 2007 statement that Brown lacked "the ability to do some high level tasks efficiently as of yet, such as typing a keyboard or operating a phone switchboard, i.e., tasks she would need to be able to do to successfully make a full time return to work"; (Docket Entry No. 33-1, Ex. 9); and (3) Dr. Shah's July 17, 2007 indication on a Reliance Standard form that from June 12, 2006 to the "present" Brown "was or will be continuously totally disabled (unable to work)."  (Docket Entry No. 33-2, Ex. 16).  Kastle could

---

[16] Kastle objected that Dr. Mohatny's statements to Brown are inadmissible hearsay.  (Docket Entry No. 40, at 4).  In response, Brown filed a sworn affidavit by Dr. Mohatny stating: (1) "I evaluated Ms. Brown in January 2006.  After evaluating her I was of the opinion that she could resume appropriate duties taking into account [] her left side weakness"; and (2) "She was advised to continue physical therapy and rehabilitation with aim to achieve maximum improvement in her weakness."  (Docket Entry No. 41-1, Ex.).  The hearsay objection is overruled.

also point to Dr. Shah's indication that Brown could not engage in the following activities "on a regular basis in an 8-hour workday": standing, walking, squatting at knees, climbing stairs, climbing ladders, kneeling, crawling, using foot controls, or driving.  (Docket Entry No. 37-2, Ex. Q2, Physical Capabilities Questionnaire).  Dr. Shah also indicated that Brown could only "[occasionally]" sit or bend at the waist.  (*Id.*).

However, there is conflicting evidence from the same period.  In response to a Physical Capabilities Questionnaire from Reliance Standard, Dr. Shah stated that Brown could use her right upper extremity "continuously" for the following tasks: simple grasping, preaching above mid-chest, reaching at the waist or desk level, fine manipulation, and feeling or tactile sensation.  (*Id.*).  Dr. Shah stated that Brown could "frequently" use her right upper extremity for pushing or pulling.  (*Id.*). Collectively, these statements and reports, with the other record evidence, create a triable issue of fact as to whether Brown was a qualified individual in March 2007.  Dr. Shah's Physical Capabilities Questionnaire, combined with Dr. Mohatny's earlier statements, show that Brown could perform a wide range of tasks with her right arm.  Brady acknowledged that the essential functions of the night-shift supervisor and alarmist positions could be performed using one arm.  There is sufficient evidence in the present record to support an inference that while Brown might not have been able to sit, stand, or walk on a "regular basis" over an eight-hour workday, with a flexible schedule she could perform the positions' essential functions.  Finally, while Dr. Yang, Dr. Shah, and Dr. Mohatny also expressed doubts about Brown's ability to work on a full-time basis, none of these statements address whether, working a flexible schedule in a job that allowed her to sit for extended periods and use only her right arm, she could perform the essential functions of an alarmist or night-shift supervisor.

27

Kastle emphasizes that Brown represented herself as "totally disabled" and received both long-term disability benefits from Reliance Standard and Social Security benefits through March 2007.  (Docket Entry No. 33, Ex. 2B, Brown Depo. at 103–05).  Kastle argues that Brown has not provided an explanation as to how she could represent herself as unable to work for the purposes of receiving disability benefits but able to work for the purpose of her ADA claim.  Under *Cleveland v. Policy Mgm't Sys.*, Brown must provide an explanation reconciling these positions.  526 U.S. 795, 797, 119 S. Ct. 1597, 143 L. E. 2d 966 (1999); *see also Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 259 (5th Cir. 2001) ("*Cleveland* teaches that a plaintiff cannot change his story during litigation without a sufficient explanation for his inconsistent assertions.").  Brown explains that she understood the Reliance Standard, Social Security, and ADA definitions of "disabled" to differ.  (Docket Entry No. 36-1, Ex. A at # 30); *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 479 (5th Cir. 2000) (noting that "sworn statements which superficially appear to negate an essential element of the ADA case must be explained by the plaintiff").  Brown's explanation is adequate to survive summary judgment.  Under the different definitions, she could both be able, with reasonable accommodation, to perform the essential functions of an alarmist or night-shift supervisor and eligible for Social Security and disability benefits.  *See Giles v. Gen. Elec. Co.*, 245 F.3d 474, 484 (5th Cir. 2001) (finding that the plaintiff's testimony that he could perform his job with reasonable accommodation provided sufficient explanation for a jury to conclude that notwithstanding representations made to obtain Social Security benefits, he was a qualified individual under the ADA).

Brown made no factual representations about "total disability" to Reliance Standard inconsistent with her claim that she could work for Kastle at the time of her discharge.  *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 465 (5th Cir. 2005) ("[E]stoppel will apply in

28

those cases . . . where the plaintiff's factual descriptions supporting disability preclude the possibility of qualification as of a certain date."). Brown represented herself as "disabled" twice: first in her September 2006 application for long-term benefits, when she indicated that she was "totally disabled," (Docket Entry No. 33-2, Ex. 17), and second in her July 2007 representation to Reliance Standard that the time by which she would resume employment was "unknown," (Docket Entry No. 33-2, Ex. 14). To be eligible for long-term disability benefits from Reliance Standard, Brown had to be "Totally Disabled" within the policy's definition. (Docket Entry No. 33-2, Ex. 17). Under the Reliance Standard policy, "'Totally Disabled' and 'Total Disability' mean an inability to perform "the material duties of [the claimant's] regular occupation." (Docket Entry No. 36-21, Ex. S2). By contrast, "'Partially Disabled' and 'Partial Disability' mean that . . . an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis." (*Id.*). Importantly, under the policy, "An insured who is Partially Disabled *will be considered Totally Disabled*, except during the Elimination Period." (*Id.*). (emphasis added). The "'Elimination Period' is a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable. It begins on the first day of Total Disability." (*Id.*). Neither side identifies Brown's "Elimination Period." But the record shows that Reliance Standard paid Brown disability benefits beginning on September 8, 2006, (Docket Entry. No. 36-20, Ex. S1). No benefit is payable during the Elimination Period, so the Elimination Period must have ended before that date. After September 2006, Brown could have been "Partially Disabled" and still considered "Totally Disabled" under the Reliance Standard policy. A "Partially Disabled" individual is one who can perform a job's "material" (as opposed to "essential") functions "on a part-time basis or some of the material duties on a full-time basis." (Docket Entry No. 36-21, Ex. S2). A "Partially Disabled" individual can be a qualified individual

29

under the ADA.  Additionally, even assuming that Brown interpreted "Total Disability" literally, this does not create a factual inconsistency requiring summary judgment.  Brown made this representation in September 2006.  The record shows, and Brown acknowledges, that her condition improved over time in response to physical therapy.  (Docket Entry No. 36-1, Ex. A at #12).  Brown only argues that the improvements she experienced, while sufficient to qualify her for the job of alarmist or night-shift supervisor, were insufficient for her to be considered not disabled.  The record discloses disputed fact issues material to resolving her contention.

Similarly, an "SSA representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'"  *Cleveland*, 526 U.S. at 802.  The Social Security Administration defines "disability" as an "inability to engage in any substantial gainful activity by reason of any . . . physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(a)(1).  The impairment must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(1)(A).  The SSA does not "take the possibility of 'reasonable accommodation' into account."  *Cleveland*, 526 U.S. at 803.  Again, Brown's explanation of her Social Security benefits claim for disability benefits is adequate to preclude summary judgment based on estoppel.  Provided a reasonable accommodation—a modified schedule that would accommodate her left-side weakness and need for physical

therapy—there is evidence that she could perform the positions' essential functions and that absent

a reasonable accommodation, she could not.[17]

### C.    Reasonable Accommodation

Brown alleged that Kastle denied her an accessible entrance to its facility, refused to allow

her to return to work, refused to consider a modified work schedule, and rejected and disregarded

the medical documentation from her physicians.  In response, Kastle argues that Brown never

responded to its November 2006 letter asking her to identify her disability and any specific

accommodations.  Brown responds that she had her physicians send letters in response to Kastle's

request; that these letters provided the information sought in the November 2006 letter; and that it

was Kastle, not Brown, who refused any interaction about reasonable accommodations.  The record

reveals a triable issue of fact as to whether Kastle refused to engage Brown in an interactive process

about her request for a modified work schedule.  However, the record does not show any triable

issue as to whether Kastle refused to engage Brown in an interactive process about a request for

access to the facility because Brown never requested such an accommodation.

Discrimination against "a qualified individual on the basis of disability includes: . . . not

making reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability who is an applicant or employee, unless such covered entity

can demonstrate that the accommodation would impose an undue hardship on the operation of the

---

[17] That Brown has provided an adequate explanation is further demonstrated by the differences between her and the plaintiffs in *Holtzclaw*.  The *Holtzclaw* plaintiff offered "no explanation" for the seeming contradiction in claiming disability for the purpose of obtaining benefits and no disability for the purpose of suing under the ADA.  *See Holtzclaw*, 255 F.3d at 285.  In *Holtzclaw*, the plaintiff "certified to the LTD insurer that he never expects to return to work and this 'illness is chronic and will never go away."  *Id.*  Brown made no such certification.  Instead, she indicated that her return to work was "unknown."  Finally, the *Holtzclaw* plaintiff made a strong statement of disability to his insurer, unequivocally stating "that he was 'unable to work at all,' that he would never be able to return to work, and that his condition could not reasonably be accommodated by an employer."  *Id.* at 257. Brown made no similar assertion.

business of such covered entity."  42 U.S.C. § 12112 (5A).  "EEOC regulations promulgated to implement the ADA define 'reasonable accommodation' as '[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.'"  *Chevron Phillips Chemical Co.*, 570 F.3d at 621 (citing 29 C.F.R. § 1630.2( o)(1)(ii)).  "An employee who needs an accommodation because of a disability has the responsibility of informing her employer."  *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996).  "The employee must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase 'reasonable accommodation.' Plain English will suffice."  *Chevron Phillips Chemical Co.*, 570 F.3d at 621 (citing EEOC "Requesting Reasonable Accommodation" in Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA (Oct. 17, 2002), available at http:// www. eeoc. gov/ policy/ docs/ accommodation. html).  "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . .  to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations."  *Id.*; *Taylor*, 93 F.3d at 165.  Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability."  *Chevron Phillips Chemical*, 570 F.3d at 621 (citing *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)).  The process requires "communication and good-faith exploration."  *Id.* (citing *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir.2007)); *see also Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed.

2d 589 (2002).  When an employer does not engage in a good-faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations.  *Chevron Phillips Chemical*, 570 F.3d at 621 (citing *Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 113 (5th Cir.2005) ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively discharging the employee before an accommodation can be considered or recommended.")); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633–34 (7th Cir. 1998).

Brown has provided sufficient evidence to give rise to a triable fact issue as to whether she satisfied the requirements for the interactive process.  The record shows that Brown communicated to Kastle the nature of her disability and her need for accommodation.  Sometime after November 2006, Saunders told Brown's mother that FMLA paperwork had to be completed before Kastle could "proceed."  (Docket Entry No. 36-22, Ex. T at #19).  Sometime in January 2007, Kastle was sent the following documents on Brown's behalf: (1) a letter from Dr. Stephen Yang; (2) a letter from Dr. Mohatny; and (3) her FMLA paperwork filled by Dr. Mohatny.  (Docket Entry No. 36-5, Ex. E; No. 36-10, Ex. J).  These letters contained information about Brown's condition and a work schedule that would accommodate her weakness.  A doctor need not use the words "reasonable accommodation" to make such a request on a patient's behalf.  *Chevron Phillips Chemical*, 570 F. 3d at 621 (finding that a jury could find a doctor's letter stating only that the plaintiff needed to work closer to home constituted adequate communication of a disability and request for accommodation); *see also Mungia v. Judson I.S.D.*,  No. SA-09-CV-395-XR, 2010 WL 1780358, at *6 (W.D. Tex. Apr. 29, 2010) (letter from counsel triggered obligation to engage in interactive process).

It is correct that "when the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider, a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation." *Taylor*, 93 F.3d at 165. But there is record evidence that Kastle was aware of Brown's condition, knew that she wanted to return to work, and had the doctors' letters.

By contrast, Brown did not fulfill her duty to request what she asserts was a second reasonable accommodation, access to the second floor. Brown admitted that she never asked Kastle to provide this as a reasonable accommodation of her disability. (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 59). This part of her reasonable accommodation claim fails as a matter of law. *Taylor*, 93 F.3d at 165; *see also Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) ("It is the plaintiff's burden to request reasonable accommodation.").

Evidence that Brown started the interactive process by asking for a modified schedule, standing alone, does not establish an ADA claim. *Allen*, 204 F.3d at 622 (5th Cir. 2000). Brown also must demonstrate that Kastle failed to engage in the interactive process in good faith. *Chevron Phillips Chemical*, 570 F.3d at 621. As evidence of this element, Brown points to the fact that after receiving the doctors' letters, Kastle did not communicate with her but instead terminated her employment. This evidence raises a disputed fact issue material to determining whether Kastle failed to provide a reasonable accommodation, in violation of the ADA. *Id.*; *see also Cutrera*, 429 F.3d at 112–13 (beginning the interactive process followed by firing the employee creates a triable fact issue of discrimination by failing to provide reasonable accommodation).

Kastle cites cases holding that to engage in the interactive process, an employee must show up for work. *See EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471–72 (5th Cir. 2009); *Loulseged v.*

*Akzo Nobel Inc.*, 178 F.3d 731, 734 (5th Cir. 1999).  These cases deal with employees who quit work after being denied potentially unreasonable requests for accommodation.  An employer has no obligation to provide such an accommodation.  *Id.*  By contrast, in the present case, Brown was on medical leave.  The evidence shows that she followed Kastle's instructions about the steps necessary to "proceed" by having the FMLA paperwork completed and her doctors provide information about her medical condition, and in response Brown heard nothing from Kastle until her employment was terminated.  *See, e.g.*, *McGregor* 2010 WL 3082293 at *9 (request of modified work schedule before employment is a request for a reasonable accommodation).

Kastle also responds that it more than accommodated Brown during the long period of her leave.  *See, e.g.*, *Cortez v. Raytheon Co.*, 663 F. Supp. 2d 514, 525 (N.D. Tex. 2009) (finding employer was reasonably accommodating in spite of denying additional leave time because it had already allowed nine months of leave).  Whether Kastle was obligated under the FMLA or otherwise to provide Brown an extended leave period is separate from the issue of whether it denied Brown a reasonable accommodation at the work place so that she could return from leave and resume employment.  The evidence in the present record shows that by March 2007, when Kastle discharged Brown, she had communicated that she could work if allowed a modified schedule, but Kastle had failed to engage in the interactive process.  This evidence precludes summary judgment on the ground Kastle asserts.

### D.    Adverse Employment Action

Brown alleges that Kastle discharged her because of her disability.  In her complaint, Brown points generally to Kastle's refusal to allow her to return to work, Kastle's insistence that Brown take a typing test, and Kastle's promise to keep Brown's job open for her.  Kastle seeks summary judgment that it discharged Brown because she had exhausted her FMLA leave and not returned to

work.  The evidence in the record discloses disputed fact issues as to  whether Kastle discharged Brown because of her disability, precluding summary judgment.

"An adverse employment action consists of 'ultimate employment decisions' such as hiring, granting leave, discharge, promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.2d 272, 282 (5th Cir. 2004).  "[I]t is beyond dispute that a termination constitutes and adverse action." *Id.*; *see also Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001).  "Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.'"  *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (quoting *Soledad v. United States Dep't of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002)).  "Unknowing, negligent, or benign handicap discrimination that produces a failure to make a reasonable accommodation" is insufficient.  *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.35 350, 366 (5th Cir. 1995).

Brown has made a *prima facie* showing of discriminatory termination.  The burden shifts to Kastle to articulate a legitimate, nondiscriminatory reason for its action.  *Gowesky*, 321 F.3d at 511; *see Manning v. Chevron Chem. Co*, 332 F.3d 874, 881 (5th Cir. 2003); *Sherrod v. Am. Airlines, Inc*., 132 F.3d 1112, 1122 (5th Cir. 1998).  Kastle has satisfied this burden.  Brown has the burden of raising a disputed fact issue that the proffered reasons are pretextual.  *Gowesky*, 321 F.3d at 511.  To raise an inference of pretext in the face of an employer' nonretaliatory explanation, a plaintiff "must produce substantial evidence of pretext."  *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402–03 (5th Cir. 2001).  A  showing that "a discriminatory motive more likely motivated [an] employer's decision" may include "evidence of disparate treatment, or that [the employer's] explanation is unworthy of credence."  *Wallace v. Methodist Hosp. Sys*, 271 F.3d 212, 220 (5th Cir.

36

2001) (quotations and citations omitted).  At the pretext stage, the issue on summary judgment is whether the totality of the evidence, including the evidence raised at the *prima facie* case and pretext stages, raises a genuine issue of disputed fact material to determining whether the defendant fired or took other adverse action against the plaintiff because of her disability.  *See Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725; *Anderson*, 477 U.S. at 255.  "It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47, 120 S. Ct. 2097, 147 L.E. 2d 105 (2000); *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 861 (5th Cir. 2010).

Brown alleged and presented evidence of the following facts from which a reasonable jury could determine that her disability was the reason for Kastle's decision to discharge her.  First, the timing of the decision.  Brown was not fired when her FMLA leave expired, casting doubt on the proffered reason for the action.  Second, the proximity in time between the letters from the doctors stating that Brown could not work a full schedule or in jobs requiring both arms and hands—which Brady testified was not the case with jobs at issue–combined with Kastle's failure to communicate with Brown during this period, supports the inference that Kastle discharged her because of her disability.  *See Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (a causal connection may be inferred from evidence that the protected conduct was closely followed by the adverse employment action, so long as "the temporal proximity [is] very close."); *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001) ("[A] time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes."); *Tabatchnik v. Continental Airlines*, No. H-06-1095, 2006 WL 3499524, at *7 (S.D. Tex. Dec. 5, 2006) (23 days is close proximity).  Third, while Kastle points to Brown's failure to take the typing test, there is evidence in the record inconsistent with this argument.  Steckbeck told Brown that

Brady wanted her to take the test because of Brady's concern that Brown's "left side was not working."[18]   (Docket Entry No. 37-3, Ex. R at 3).   But, as noted, Brady acknowledged that Brown needed only one side of her body to perform the essential functions of an alarmist or night-shift supervisor.   (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 125–26).   This acknowledgment is inconsistent with Kastle's argument that the typing test was a legitimate requirement to determine whether Brown's condition prevented her from filling the essential functions of the positions at issue.   *See* 29 C.F.R. § 1630.14(c) (an employer "may make inquiries into the ability of an employee to perform job-related functions"); *Conroy v. N.Y. St. Dep't of Correctional Services*, 333 F.3d 88, 98 (2d Cir. 2003) ("The case law on inquiries directed towards individual employees thus demonstrates that courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine [] whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.").   Neither Brady nor Steckbeck defended the typing test as necessary to measure Brown's ability to perform job-related functions.   Nor does the record present evidence that typing thirty words per minute was a job-related function.[19]   *See* *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811–12 (6th Cir. 1999) (adopting EEOC interpretation that "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job").   Instead, Kastle insists that it implemented the typing test pursuant to a policy initiated by Brady and Radigan sometime in May 2005 of requiring all employees who miss over ninety days of work to "recertify."

---

[18]   Kastle objects that this evidence constitutes double hearsay.   However, both Brady's statement to Steckbeck and Steckbeck's statement to Brown are party-opponent statements.   FED. R. EV. 801(D)(2).

[19] Nor does the record disclose that Kastle required any other employee with similar positions who wanted to return to work after 90 days to take a typing test.

(Docket Entry No. 32-4, Ex. 3, Brady Depo. at 72).  Brady suggested that the Texas Board of Private Investigators required "recertification," but the elements of "recertification are unclear.  Brady testified that the testing policy is not required in other regions, was not approved by Kastle's headquarters, and was never reduced to writing.  (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 71–73).  The employee handbook does not mention the policy despite Brady's claim that she and Radigan implemented it as early as 2005.  (*Id.* at 72; Docket Entry No. 36, at 20).  And both Steckbeck and Brady told Brown that Kastle would be flexible should she fail the test, (Docket Entry No. 32-3, Ex. 2A, Brown Depo. at 27, 31), which is inconsistent with Brady's assertion of the policy as a requirement.

Kastle alternatively argued that it did not intentionally discriminate and that Brown might have "[fallen] through the cracks" and should have been discharged when she exhausted her FMLA leave.  (Docket Entry No. 32-4, Ex. 3, Brady Depo. at 106; No. 32-6, Ex. 5, Saunders Depo. at 26, 46–47).  Kastle's own communications to Brown are inconsistent with this position.  Kastle's November 2006 letter explicitly stated that it "would like to explore whether there are accommodations that would allow you to return to work."  (Docket Entry No. 36-6, Ex. F).  Kastle's Decemeber 2006 letter told Brown to pay the employee portion of her insurance premiums.  (Docket Entry No. 36-22, Ex. T, # 17).

In sum, while Kastle argues that it discharged Brown because she had exhausted her FMLA leave and because she had failed to report to work, Brown has submitted evidence that these stated reasons are unworthy of credence.  *See Wallace*,, 271 F.3d at 220.  Kastle's inconsistent, vague, and belated communications with Brown about her FMLA leave and the status of her job, with the other evidence in the record, raise a disputed fact issue as to whether Kastle discharged her because of her disability.  *See Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 37 (1st Cir. 2010) ("An employee

39

can establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted nondiscriminatory reasons." (internal quotations omitted)). Brown has produced evidence indicating that before and immediately after her surgery, she was told not to worry about the FMLA paperwork.  (Docket Entry No. 36-1, Ex. A at #10; Docket Entry No. 36, Ex. T at #8).  Her FMLA leave expired in September 2006, but Kastle did not communicate to Brown that her FMLA leave had expired until November 2006.  Had Kastle only made a mistake in failing to inform Brown that her FMLA leave had expired, Kastle's reason for discharging Brown might withstand summary judgment.  *Sherrod v. American Airlines, Inc.*, 1996 WL 700518, at *5 (N.D. Tex. Dec. 3, 1996), *partially overruled on other grounds by* 132 F.3d 1112 (5th Cir. 1998).

 *C.f. Durose v. Grand Casino of Miss., Inc.*, 251 Fed. App'x 886 (5th Cir. Oct. 23, 2007) (employer's mistakenly informing employee of extended leave time does not create a right to such leave).  But there is evidence that could support an inference that Kastle did not even consider whether Brown was still entitled to FMLA leave until it decided to discharge her.  There is no FMLA documentation dating from at or around Brown's surgery.  Kastle's employee handbook requires medical certification for FMLA leave—"Acceptable medical certification is required for any leave related to a serious health condition of the employee or family member" (Docket Entry No. 36-7, Ex. G at 23)—but Kastle appears not to have received or requested any medical certification until November 2006.  The handbook does not state that exhaustion of FMLA leave requires termination.[20]

---

[20] Kastle also argues, citing *Roberts v. Mega Life and Health Ins. Co.*, No. 304-CV-756M, 2005 WL 659026, at *6 (N.D. Tex. Mar. 22, 2005), that an employer need not inform an employee that it considered her on leave to terminate an employee consistent with practice.  The case is distinguishable.  In *Roberts*, the employer had a stated policy of terminating employees automatically after eighteen months of leave.  *Id.* at *1, *6.  Kastle's FMLA policy as stated in its handbook contains no similar policy.  (Docket Entry No. 36-7, Ex. G).  Additionally, the employer in *Roberts*, unlike Kastle, had offered and the employee had refused a

Kastle's communications after sending the November 2006 letter also support an inference of pretext.  When Brown's mother contacted Kastle about the expiration of the FMLA leave and its effect on Brown's employment,  Kastle responded that it was "just a letter."  (Docket Entry No. 36-22, Ex. T at #16).   Despite Kastle's claim to the contrary, there is evidence that Brown did communicate with Kastle about returning to work.  In January 2007, she made an attempt to take the typing test.  (Docket Entry No. 36-22, Ex. T at #19).  On some unknown date after the November 2006 letter, Brown responded to Kastle's request for further documentation by having Dr. Mohatny send the FMLA paper work and by having Drs. Mohatny and Yang send letters.  (Docket Entry No. 36-5, Ex. E; No. 36-10, Ex. J).

Kastle had no FMLA duty to grant leave after the statutory period expired.  *Reed*, 218 F.3d at 481; *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 759 (5th Cir. 1996).  But Brown does not allege that she needed extended leave.  Instead, she asserts that in January 2007, she was prepared to return to work.

The record contains inconsistent evidence, including evidence supporting Kastle's arguments.  There are long periods of silence by Brown.  In October 2006 Brady told Brown that she could take the typing test at any time, but Brown's first and only attempt to do so was five months later, in January 2007.  (Docket Entry No. 36-9, Ex. I).  In November 2006, Brown received a letter from Kastle stating that her FMLA leave had expired and asking her to indicate when she would be returning to work and whether she would need accommodations.  Yet it was not until January 2007 that Brown had the FMLA paperwork and reports of her condition sent to Kastle and the evidence of accommodation request is not robust.  But Brown has also provided evidence explaining her own actions and her basis for believing that she did not need to contact Kastle

reasonable accommodation. *Id.* at *6.

41

because she had been assured that her job was secure over the relevant periods.  Before November

2006, Kastle had assured Brown that she could resume employment; in November 2006, when

Brown's mother asked Kastle about the meaning of the FMLA letter, she was told not to worry

about it; and Brown has asserted that Kastle did not give her any deadlines.  (Docket Entry No. 36-

22, Ex. T at #10; No. 32-3, Ex. 2A, Brown Depo. at 31; Docket Entry No. 36-22, Ex. T at #16).

Finally, there is evidence of Kastle's failure to engage Brown in the interactive process.  Kastle has

neither identified nor submitted evidence that when it discharged Brown in March 2007, it was not

in position to offer her reasonable accommodation. *Calbillo*, 288 F.3d at 725 (analyzing on summary

judgment whether "the totality of the evidence, including the evidence raised at the *prima facie* case

and pretext stages, raises a genuine issue of disputed fact material to determining whether the

defendant fired or took other adverse action against the plaintiff because of his disability").

The present record precludes summary judgment dismissing the discriminatory discharge

claim.

### E.    Disability-Based Workplace Harassment

Brown alleges that from the time between her surgery and her discharge, Kastle maintained

an abusive workplace that was severe or pervasive and affected a term, privilege, or condition of

Brown's work.  The acts forming the basis of this claim are the same acts forming the basis of

Brown's other claims:

> "(1) Defendant denied Plaintiff an accessible entrance into its facility, (2) Defendant
> refused to allow Plaintiff to return to work, (3) Defendant arbitrarily insisted on
> Plaintiff taking a typing test to see if her left side worked, (4) Defendant arbitrarily
> rejected and disregarded Plaintiff's medical documentation from her physician, (5)
> Defendant made oral promises to keep Plaintiff's job open for her during medical
> leave yet terminated Plaintiff, (6) Defendant purposefully misled Plaintiff about her
> obligations and duties that it ultimately held Plaintiff responsible for, and (7) [o]ther
> harassing communications and conduct."

(Docket Entry No. 12, at ¶ 21).

The Fifth Circuit has recognized a cause of action for disability-based harassment as a hostile work environment under the ADA. *See Flowers v. Southern Regional Physician Services, Inc.*, 247 F.3d 229, 232-35 (5th Cir. 2001) ("It is evident, after a review of the ADA's language, purpose, and remedial framework, that Congress' intent in enacting the ADA was, inter alia, to eradicate disability-based harassment in the workplace."), *on subsequent appeal on other grounds*, 286 F.3d 798 (5th Cir. 2002). Modeled after the elements of a similar claim under Title VII, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Id.* at 235–36 (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)). The harassment must " 'be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.' " *Id.* at 236 (citing *McConathy*, 131 F.3d at 563). To determine if the work environment is abusive, the court should consider "the entirety of the evidence, including 'the frequency of the discriminatory conducts, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance.' " *Id.* (citing TCHRA, Texas Labor Code, § 21.051 et seq.).

Brown's claim fails because none of her allegations covers actions in the workplace while Brown was working. In the Fifth Circuit, to succeed on this claim Brown must allege harassment that actually occurred "*in the workplace*." *Gowesky*, 321 F.3d at 510 (emphasis in original). Brown does not allege harassment that is sufficiently "pervasive or severe to alter the conditions of

43

employment." *Flowers*, 247 F.3d at 236.

## IV.    Breach of Contract

Brown alleges that statements made to her by Steckbeck and Brady promising that she could return to work when she had sufficiently recovered modified her at-will employment contract with Kastle, and that Kastle breached this contract by discharging her in March 2007. Kastle responds that none of the evidence Brown points to manifests a specific agreement to modify her at-will employment status. This court finds that Brown has failed to raise a disputed fact issue material to determining whether such an oral contract existed.

In Texas, an employment relationship is at-will unless an employment contract limits "in a meaningful and special way" the employer's right to discharge the employee without cause. *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 577-78 (Tex. App.—Houston [1st Dist.] 1992, no pet.). The employer must unequivocally indicate its intent to be bound not to discharge the employee except under specified circumstances. *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998). To be enforceable, an agreement to modify the employment-at-will relationship must be express rather than implied and clear and specific. *See id.* at 502.

The record does not raise a disputed fact issue material to determining whether Brown and Kastle agreed to modify her employment status. (Docket Entry No. 32-10, Ex.19). To support her contention, Brown points to statements in her contemporaneous journal that "they told me whenever I get out of the hospital my job will be there at the same pay," (Docket Entry No. 36-15, Ex. N), and Brown's mother's recollection of Steckbeck telling Brown that her job would "be there" and she should "focus on [her] health." (Docket Entry No. 36-22, Ex. T at #10). Accepting these assertions as true for the purpose of the summary judgment motion, there is no enforceable oral contract to modify Brown's employment-at-will status. The test for whether an employer's statement modifies

the at-will employment relationship is whether there was a clear and specific express agreement to do so, not whether the employee interpreted the statements as a promise not to fire the employee. *See Williams v. Perot Systems Corp.*, No. 05-96-00482-CV, 1998 WL 136484, at *3 (Tex. App.—Dallas March 11, 1998, no pet.) (citing *Byars v. City of Austin*, 910 S.W.2d 520, 523 (Tex. App.—Austin 1995, writ denied). Brown's impression that Steckbeck had modified her employment status is insufficient. There is no record evidence that Kastle manifested a "definite intent to be bound not to discharge the employee except under clearly specified circumstances." *Brown*, 965 S.W.2d at 502; *Mikssch v. Exxon Corp.*, 979 S.W.2d 700, 704 (Tex. App.—Houston 1998). "[V]ague, oral assurances of future job security . . . are insufficient to modify an employee's at-will employment." *See Ameen v. Merck & Co., Inc*, 226 Fed. App'x. 363, 374 (5th Cir. 2007) ("[W]ith respect to promissory estoppel claims, vague oral assurances of future job security, such as that alleged here, are insufficient to modify an employee's at-will employment status."); *Herod v. Baptist Foundation of Texas*, 89 S.W.3d 689, 693 (Tex. App.–Eastland 2002, no pet.) (finding that the statement, "you'll just continue on as the chief administrative officer and have those responsibilities," was too vague to modify employment at-will status); *Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003) ("[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.").

Kastle's motion for summary judgment on the breach of contract claim is granted.

## V.   Intentional Infliction of Emotional Distress

Brown argues that Kastle's conduct from her surgery to her discharge constituted "outrageous conduct" and was "with intent to cause, or with reckless disregard for the probability of causing Brown to suffer severe emotional distress." Kastle responds that the facts Brown

identifies to support this claim are the same facts giving rise to her ADA claim. Because intentional infliction of emotional distress is a "gap filler," Kastle argues that Brown cannot assert both claims arising out of the same facts. Kastle also argues that its actions were not sufficiently outrageous as needed to find intentional infliction of emotional distress. This court agrees that taking the evidence in the light most favorable to Brown, she cannot recover on intentional infliction of emotional distress. Under Texas law, the tort of intentional infliction of emotional distress requires that plaintiff prove that: 1) the defendant acted intentionally or recklessly; 2) the conduct was extreme and outrageous; 3) the defendant's actions caused plaintiff emotional distress; and 4) the resulting emotional distress was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Liability under this cause of action is imposed "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. (1965)); *see also Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993). The cause of action does not protect against mere insults, indignities, or threats. *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 33 (5th Cir. 1992). In the employment context, a claim for intentional infliction of emotional distress will not be supported by the broad range of conduct labeled as "mere employment disputes." *Johnson*, 965 F.2d at 33. "In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees." *Id.* at 34. "The intentional infliction of emotional distress [is], first and foremost, a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). "The tort's 'clear purpose,. . . [is] to

46

supplement existing forms of recovery by providing a cause of action for egregious conduct' that might otherwise go unremedied." *Id.* (citing *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998). A claim for intentional infliction of emotional distress should be independent of other statutory claims. *Swafford v. Bank of America Corp.*, 401 F. Supp. 2d 761, 764 (S.D. Tex. 2005).

Brown's intentional infliction of emotional distress claim fails for two reasons. First, her intentional infliction of emotional distress claim cannot exist with her ADA claim, which arises from identical facts. (Docket Entry No. 12, at ¶ 24). Brown acknowledged in her deposition that the facts giving rise to this claim are the same facts giving rise to her discrimination claim. (Docket Entry No. 32-4, Ex. 3, Brown Depo. at 36). Under *Hoffman-Laroche*, "[i]f the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." 144 S.W.3d at 448. And the facts Brown alleges do not rise to the level of outrageousness described in *Twyman*, 855 S.W.2d at 621. The Fifth Circuit's decision in *Dean v. Ford Motor Credit Co.*, 885 F.2d 300 (5th Cir. 1989), is instructive as to the type of conduct that rises to the level of "extreme and outrageous" in the employment context. In *Dean*, the plaintiff presented evidence that her supervisor intentionally placed checks in her purse to make it appear that the plaintiff was a thief, or to put her in fear of criminal charges for theft. *Dean*, 885 F.2d at 304, 306–07. The plaintiff also presented other evidence that she had frequently been reassigned, had been downgraded in performance reviews, suspended, and ultimately fired. In affirming the jury's verdict in favor of the plaintiff over the defendant's challenge, the Fifth Circuit held that the "check incidents . . . [were] precisely what [took] this case beyond the realm of an ordinary employment dispute and into the realm of an outrageous one." *Id.* Similarly, in *Wilsop v. Monarch Paper Co.*,

939 F.2d 1138 (5th Cir. 1991), the plaintiff presented sufficient evidence to support the jury's verdict in his favor by showing that the defendant company, as part of a plan to get rid of older employees, tried to force plaintiff, a 60-year-old executive, to resign by making him perform routine janitorial duties before and in behalf of his fellow employees. *Wilson*, 939 F.2d at 1145. The plaintiff presented other evidence of mistreatment at work and age discrimination; the court held that this conduct, as offensive as it may have been, was within the "realm of an ordinary employment dispute." *Id.* at 1144–45. However, assigning janitorial duties to an executive in order to humiliate him into resigning was "outrageous conduct" that took the case "out of the realm of an ordinary employment dispute." *Id.* at 1145. No comparable evidence is presented here. Brown's claim for intentional infliction of emotional distress is summarily dismissed.

## VI.     Conclusion

Kastle's motion for summary judgment on Brown's ADA reasonable accommodation and adverse employment action is denied. Kastle's motion for summary judgment on Brown's disability-based workplace harassment, breach of contract, and intentional infliction of emotional distress claims is granted. A status conference is set for **September 16, 2010, at 8:30 a.m.**

SIGNED on August 25, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

48